## COWPERTHWAITE *vs.* SHEFFIELD and others.

A bill of exchange drawn against a consignment of goods and a mere letter of advice from the consignor to the consignee do not, it seems, operate as a specific appropriation of the proceeds of the goods to the payment of the bill.

On a shipment of cotton from Mobile to Glasgow, the shipper drew bills on the consignee against the proceeds and advised him thereof.  The bills being presented before the cotton arrived, acceptance was refused.  The cotton was received and sold by the consignee, and by a subsequent arrangement between him and the shipper the proceeds were deposited with a third party, to be paid over to the shipper when his creditors should assent thereto; the shipper intending to apply such proceeds to the payment of the bills.  The holder of the bills in England, who also held other demands against the shipper, got possession of the fund (which was sufficient to pay the bills) by a judicial proceeding founded on the bills and his other demands.  In an action against the indorser of the bills, *held* that the bills and letter of advice did not operate as an appropriation of the proceeds of the cotton to the payment of the bills, and therefore that the facts stated did not sustain the defence of payment.

Where, in an action against the indorser of a bill the defendant moved for a nonsuit without stating any specific objection to the notice of protest, and the motion was denied, *held*, that on a motion for a new trial on a bill of exceptions, the sufficiency of the notice could not be inquired into.

COWPERTHWAITE, for the benefit of the Bank of England, brought assumpsit in the superior court of the city of New-York against Sheffield & Co. as the second indorsers of two bills of

exchange. Plea, the general issue, and payment. On the trial before OAKLEY, J. the plaintiff had a verdict, on which the superior court rendered judgment. The defendants appealed to this court. The facts are stated in the opinion of HURLBUT, J. See also 1 *Sandford's Superior Court Reports*, where the case is stated with fuller details.

*Gerardus Clark*, for appellants. I. The bills were drawn against a shipment of cotton, by the drawers to the drawees, which operated as an assignment of so much of the proceeds of the cotton in the hands of the drawees as would be sufficient to pay the bills. (*Peyton* v. *Hallett*, 1 *Caines*, 363, 379; *Mc-Mennomy* v. *Ferrers*, 3 *John*. 75, 83; *Cutts* v. *Perkins*, 12 *Mass. R.* 206; *Conroy* v. *Warren*, 3 *John. Cas.* 264; *Yates* v. *Groves*, 1 *Ves. jun.* 280; *Corser* v. *Craig*, 1 *Wash. R.* 424.) The court below erred in supposing this principle applied only to *orders*, and not to negotiable bills of exchange. There is no such distinction known in the law. (3 *John. Cas.* 264; *id.* 5; *Corser* v. *Craig*, 1 *Wash. R.* 424.) The principle we contend for, is inherent in the very nature of bills of exchange, and the question of negotiability has nothing to do with the fact of assignment. (*Chitty on Bills*, 1, 2, 8th ed. ; *Story on Bills*, § 13; 3 *Kent's Com.* 74; *Gibson* v. *Nicuet*, 1 *H. Black.* 602; *Walwyn* v. *St. Quintin*, 1 *Bos. & Pul.* 654; *Parfessus*, §§ 343, 429, 422.) It is on this principle that if the drawer of the bill, after negotiating it, withdraws the fund from the drawee, he is liable to the payee in an action for money had or received, although discharged from the bill for want of notice. (*Conroy* v. *Warren*, 3 *John. Cas.* 259, 264; *Baker* v. *Burch*, 3 *Camp.* 107.) Even if the drawer dies before acceptance or payment, it does not affect the destination of the fund. (*Cutts* v. *Perkins*, 12 *Mass. R.* 206.) The court below also erred in supposing that in order to constitute an assignment, it was necessary that the bill or order should be for the whole fund, and that it should be accepted. (*Peyton* v. *Hallett*, 1 *Caines*, 379; *Yeates* v. *Groves*, 1 *Ves. jun.* 280; *Row* v. *Dawson*, 1 *Ves. sen.* 332; *Corser* v. *Craig*, 1 *Wash. C. C. R.* 424.) In neither of these cases were

the bills or orders accepted, or drawn for the whole fund. (*See also Wheeler* v. *Wheeler*, 9 *Cowen*, 34.) In this case, the bills and the fund assigned for their payment having got into the same hands, (and the fund being sufficient,) the one paid the other, and there is no claim on the bills against any of the parties.

II. Whether there was an assignment or not, there was an *appropriation* by the drawer. And the proceeds of the cotton being more than sufficient to pay all the bills drawn by the Reids on Kelly & Co. and held by the Bank of England, the bank were bound to apply the fund to the bills, according to the original intent and direction of the drawers; it being a well settled rule of law, that a debtor has a right to apply a payment to any one of several demands of his creditor. (*Seymour* v. *Van Wyck*, 8 *Wend.* 403, 416; *Stone* v. *Seymour*, 15 *id.* 19; *Hall* v. *Constant*, 2 *Hall*, 185; *Bonaffi* v. *Woodbury*, 12 *Pick.* 456, 463; *Robinson* v. *Doolittle*, 12 *Verm. R.* 246; *Colt* v. *Netherwell*, 2 *P. Wms.* 308.) The very drawing of the bills against the cotton, and giving notice thereof to the drawees, was a *direction* for the application of the proceeds, to the payment of the bills. (3 *John. Cas.* 264.) Again, Reid, in his deposition, expressly states that the fund received from Kelly & Co. and deposited in the Bank of Liverpool, was intended to meet the demand of the holders of the bills drawn on Kelly & Co. By this very act of deposit, therefore, it became a *trust* fund, applicable only to the payment of the bills drawn on that house.

III. It is also a well settled rule of law, that the source or fund from which a payment is made, will direct the application. That is, when money has come from a particular source, it must be applied by the creditor in *relief* of the source from which the fund arose. (*Hicks* v. *Bing*, 11 *Mass. R.* 300; *Gwyn* v. *Whitaker*, 1 *Harr. & John.* 754, 5; *Brett* v. *March*, 1 *Vern.* 463; *Weller* v. *Lacy*, 1 *Man. & Gran.* 54.)

IV. In the absence of any specific application, the presumed intention of the debtor is to govern. The whole doctrine of the common law, as to the appropriation of payments, is derived from the civil law. (*Gass* v. *Stimson*, 3 *Sumner*, 98; *Pattison* v. *Hall*, 9 *Cowen*, 747.) And according to the civil law rule,

if there was no positive proof of the debtor's direction as to the application of the payment, then his presumed intention always governed; and such appropriation was made as was most beneficial to him. (1 *Ev. Pothier*, 368 *to* 376, *art.* 7.) And this rule has been adopted by the American courts. (*Gass* v. *Stinson*, 3 *Sumner*, 110, 111; *Pattison* v. *Hall*, 9 *Cowen*, 768; *Robinson* v. *Doolittte*, 12 *Verm. R.* 246; *Gwyn* v. *Whitaker*, 1 *Harr. & John.* 755; *Dorsey* v. *Gassoway*, 2 *id.* 402, 412; 1 *Story's Eq. Juris.* § 459.) The presumed intention or advantage of the creditor does not govern in the application of payments, except where it is a matter of entire indifference to the debtor how the payment is applied. (*Pattison* v. *Hall*, 9 *Cowen*, 767, 771; *id.* 773, *note; Story's Eq. Jur.* § 459, *c; id.* § 459, *d.*)

V. If no application is satisfactorily shown to have been made by the debtor and there are no circumstances from which his direction may be inferred or presumed, then the creditor may make it; but if none is made by either party, then the court will make the application according to the justice and equity of the case. (*Seymour* v. *Van Wyck*, 8 *Wend.* 403; *Baker* v. *Stackpole*, 4 *Cowen*, 420; *Story on Cont.* § 980; 1 *Story's Eq. Jur.* § 459; *Creemer* v. *Higginson*, 1 *Mason*, 338; *Reed* v. *Boardman*, 20 *Pick.* 446; *United States* v. *Kirkpatrick*, 9 *Wheat.* 737; *Merrimack Bank* v. *Brown*, 12 *N. Hamp. Rep.* 320.) In this case no special application was made by the Bank of England, and therefore the fund should have been applied to the payment of the bills drawn against it.

*E. H. Blatchford*, for respondent. I. The drawing of the bills on account of a shipment of cotton, cannot be regarded as an assignment of any part of the proceeds of such shipment. The instruments in this case were naked bills of exchange, not drawn on any particular fund, and the payment being dependent upon no contingency. Were it otherwise, they would have lost their character as bills of exchange. (*Chitty on Bills*, Springfield ed. *of* 1842, *p.* 137, 8, *and cases there cited.*) Had the bills of exchange been in the form of orders for the entire proceeds of the shipment of cotton, they would, after notice to

Cowperthwaite *v.* Sheffield.

the Kellys, have operated as an assignment of such proceeds within the cases of *McMenomy* v. *Ferrers*, (3 *John.* 72,) and *Peyton* v. *Hallet*, (1 *Caines*, 363.) But had the bills in question been in the form of orders on said proceeds, as they did not embrace the entire amount, they would not have amounted to an assignment of a part, or have given a lien as against the drawees, unless Kelly & 'Co. had consented to the appropriation by accepting the orders. (*Mendeville* v. *Welch*, 5 *Wheat.* 277 ; *Tiernan* v. *Jackson*, 5 *Pet.* 580 ; *De Besse* v. *Napier*, 1 *McCord*, 106.) The bills not being accepted by Kelly & Co., there was no obligation on their part as between them and the holders of the bills to pay them at all. The disposition to be made of the proceeds of the shipment was a matter wholly between Kelly & Co. and the Messrs. Reid, the drawers, and was so treated by them in the settlement which took place.

II. The balance in question was paid over to the Bank of England, on account of eight bills of exchange which it held, drawn by Jno. and James Reid, and which did not include the bills in suit. This was done under the grant or warrant issued under the process of outlawry, and it is conclusive upon the question of the application of the amount received by the Bank of England.

III. The Bank of England had a right thus to apply the funds in question. (*Clark* v. *Burdett*, 2 *Hall*, 197 ; *Stone* v. *Seymour*, 15 *Wend.* 19 ; *Niagara Bank* v. *Roosevelt*, 9 *Cowen*, 409 ; *Baker* v. *Stackpool*, 9 *id.* 420 ; *Pattison* v. *Hull*, *id.* 747 ; *Mann* v. *Marsh*, 2 *Caines' R.* 99 ; *Briggs* v. *Dwight*, 1 *Man. & Ryl.* 308 ; *Campbell* v. *Gow*, *Dallas*, 74 ; *Hall* v. *Wood*, 14 *East*, 243 ; *Kirby* v. *Marlborough*, 2 *M. & S.* 18 ; *Peters* v. *Anderson*, *Taunt.* 596.)

HURLBUT, J. The bill of exceptions in the present case does not properly present the question which was argued at the bar, as to the sufficiency of the notice of dishonor of the bills which are the subject of this suit. When the plaintiff rested his case, he had given what he deemed sufficient proof of such notice, but he may not have exhausted all the evidence in his power.

If the defendants designed to make a point as to the sufficiency of the proof delivered, they should have objected against it specifically, and pointed out the defects which they conceived to exist in this branch of the case, in order that the plaintiff might have had an opportunity to supply such defects by the delivery of further evidence, or in default of it, that the ruling of the court might have been obtained upon the precise point presented by the objection. But instead of this, the bill of exceptions merely states, that when the plaintiff rested, the defendants' counsel moved for a nonsuit, which was denied, and the defendants excepted. This presents no question as to the sufficiency of the notice of protest. (*Gillett* v. *Campbell*, 1 *Denio*, 520; *Whiteside, &c.* v. *Jackson*, 1 *Wend.* 418; *Ford* v. *Mannor*, 20 *id.* 210; *Norman* v. *Wells*, 17 *id.* 136.)

The other questions which are presented by the bill of exceptions, arise upon the following facts:—On the 8th of February, 1837, Messrs. James and John Reid, of Mobile, drew two bills of exchange on Messrs. Kelly & Co. of Glasgow, for one thousand pounds each, and payable sixty days after sight to the order of the drawers. They were drawn against a shipment of cotton by the Messrs. Reid to Kelly & Co., of which they were advised by letter dated February, 28, 1837, which contained a notice of the shipment and of four drafts drawn on account of the same, amounting in the aggregate to four thousand pounds, including the two drafts in suit. The letter was received by Kelly & Co. on the 14th of April, 1837, and on the 15th the bills were presented to them, and were protested for non-acceptance on the 17th of the same month. The cotton arrived at Glasgow about the 27th of June, 1837, and the proceeds were credited in account of Kelly & Co. with Messrs. Reid on the 14th of August of that year. The bills contained nothing on their face indicative of their having been drawn on a specific fund, but were in the ordinary form of negotiable bills of exchange; and there is nothing in the case which shows that the defendants purchased them with information of their having been drawn against a shipment of cotton. Other bills were drawn by Messrs. Reid on Kelly & Co. against shipments

of cotton made to the latter, which, including the two bills in question, amounted in the aggregate to £4529 0 4; and all these bills, together with others of the same drawers on other houses, came into the possession of the Bank of England before their maturity, and were claimed to be owned by that bank, for whose benefit this suit is prosecuted.

John H. Reid, one of the drawers, after the failure of his firm, went to Glasgow and made a settlement with Kelly & Co. on the 15th of August, 1837, by which a balance of £4593 3 7 was found to be due to the Reids from Kelly & Co., which was sufficient to pay all the outstanding bills drawn by the former upon the latter house. This balance, by agreement between Reid and Kelly & Co., was placed in the first instance in the hands of Mr. Cuthbertson of Glasgow; and afterwards by the consent of parties the money was transferred to the Bank of Liverpool and deposited in the names Langdon & Miller, subject to the joint order of the Messrs. Reid and Kelly & Co., and to be retained until the discharge granted by the Reids to Kelly & Co. upon their settlement should be ratified by the creditors of the former.

The Bank of England was the holder of ten bills of exchange drawn by the Messrs. Reid, including the two bills in suit, and upon these bills instituted suit against the drawers (the Reids) and proceeded to outlawry against them, and under that process obtained possession of the funds which had been deposited in the Bank of Liverpool. The Messrs. Reid afterwards appeared in the suit, the outlawry was reversed, and on the 5th of March, 1842, judgment was recovered in England on all the bills, including the two now in suit, for £8893 1 5. The fund which had been seized now amounted to £4696 3 2, and the Bank of England claimed that by reason of an exception of the bills in this suit from the benefit of the seizure made in the process of outlawry, the fund thus obtained ought to be applied to the satisfaction of eight of the ten bills included in their judgment, to the exclusion of the two bills in this suit. The superior court, however, held, that the bank could not single out a part only of the separate demands upon which their judgment was recov-

ered and apply the fund to their payment to the exclusion of the bills in this suit, but must apply the amount collected through the instrumentality of the process against the drawers, as a payment upon all the bills embraced in the consolidated debt constituting the judgment—whereby the bills in this suit were reduced by a pro rata application of the fund derived from the drawers, to the same extent as the others upon which the judgment was recovered. But the defendants were not content with this; they claimed upon the trial that under the facts of this case, their liability upon the bills in suit was extinguished altogether, and they requested a ruling of the court to the effect: .

I. That the drawing of the bills against the shipment of cotton operated as an assignment of so much of the proceeds thereof as would be sufficient to pay these bills; that the drawees must be considered as having held the fund for the benefit of the holders of the bills, and that the Bank of England being such holders, and receiving the funds destined for their payment, the bills must be regarded as paid.

II. That the drawers having appropriated the proceeds of the cotton to pay all the bills drawn by them on Kelly & Co., and the fund being sufficient for that purpose, the bank was bound to apply the fund according to the intention and direction of the drawers.

The defendants, in taking these grounds of defense, seem to have mistaken the true character of this transaction, and the nature of these bills of exchange. They were not in the nature of orders drawn on a particular fund, nor were they payable upon any contingency, but were in the form of proper bills of exchange, and were negotiated as such; so that the parties thereto became answerable, not upon a special contract to be inferred from the circumstances of the case, but according to the obligation created by the bills themselves as the law defines it. Had the bills been accepted by Kelly & Co. they would have been bound to their payment, whether they received the consignment of cotton or not, and irrespective of the amount of its proceeds. There was nothing on the face of the bills either

Cowperthwaite *v.* Sheffield.

binding such proceeds to their payment, or limiting thereby the liability of the drawees. The holder had a right to require an unconditional acceptance, and in default of it, might have resorted to the drawers and indorsers for payment of the bills. The defendants' relation to them, under these circumstances, can not be distinguished from that which would arise in an ordinary transaction of negotiating bills of exchange proper, when the indorsement is made at the hazard of the bills being protested for non-acceptance.

A proper bill of exchange does not of itself operate as an assignment to the payee of the funds of the drawer in the hands of the drawee; and even after an unconditional acceptance, it can not in strictness be held to have that effect, since the drawee becomes bound by reason of the contract of acceptance, irrespective of the funds in his hands. He may refuse when he ought to accept by reason of having funds, and yet neither he nor the funds would in any way be bound or affected by the bill. The holder would have to resort to the other parties to the instrument, and the drawer's remedy to obtain the fund would depend in no respect upon the bill. If the drawee accept, he is primarily liable to pay the bill, but he is under no contract or liability beyond that created by the acceptance itself. (*Luff* v. *Pope,* 5 *Hill,* 413, *affirmed in error,* 7 *id.* 577; *Chitty on Bills,* 333; 3 *Kent's Com.* 115.)

Kelly & Co. refused acceptance, notwithstanding they had received advice of the shipment of cotton on the day preceding the presentation of the bills. This might have raised a question as between them and the drawers, as to their right to retain the consignment, without accepting the bills; but the Messrs. Reid were the only persons who could have taken any effective measures to change the disposition of the cotton, and they acquiesced in Kelly & Co.'s retaining possession and disposing of it—allowed the proceeds to enter into general account between them, and finally settled all their transactions, and assumed to own and control the balance found to be due them from Kelly & Co. without seeking to make any specific appli-

cation of the proceeds of the shipment to the payment of these bills.

But it was urged on the part of the defendants that although the drawing of the bills alone might not be held to operate as a specific appropriation of the fund in question to their payment, yet that taken in connection with the other facts in the case, such appropriation was on the whole established, and we were referred to the letter of advice and to the testimony of John H. Reid as controlling the determination of this branch of the case. The letter contains notice of four several bills, including the two in suit, having been drawn on account of the shipment of cotton—but we look in vain to this letter for an express direction as to the application of the proceeds. The Messrs. Reid no doubt expected that by reason of this advice Kelly & Co. would have been induced to honor their bills upon the prospect thus held out, of receiving funds for their indemnity—and beyond the holding out. of such inducement, it does not appear that the letter was intended to have any effect whatever. But if it could, by any equitable intendment, be held to amount to a specific direction to apply the proceeds of the shipment to the payment of these bills, it could only be in favor of a party who had notice of the arrangement, and who had purchased the bills or become liable upon them, on the faith of it, which is not the condition of the defendants in this suit. Neither this letter of advice, nor the bill of lading, accompanied the bills when they were put into the market, and there is no evidence that the defendants negotiated and indorsed them on the faith that the proceeds of the shipment of cotton would be applied to their payment.

Nothing transpired on the occasion of John H. Reid's arrangement with Kelly & Co. in Glasgow, which materially changes this aspect of the case. Although Mr. Reid states, in his testimony, that the funds in question were intended to meet the demands of the holders of the bills, drawn by the Reids on the Kellys, yet he does not testify to any fact from which such intention can be inferred, and it appears that the balance in the hands of Kelly & Co. on the 15th of August, 1837, was paid

over to the Reids on that day, who discharged the former from all indebtedness on account of their past transactions; but it was arranged for the security of the Kellys, that the fund should be held by a third person till the discharge which the Reids had given to the Kellys should be approved by the creditors of the former, and it would seem that, but for the Kellys' insisting upon being protected in the manner stated, the Reids would have received the entire fund as their absolute property, without any qualification on account of its alledged specific appropriation to the payment of the bills in suit.

On the whole, the idea of such appropriation does not seem to be supported by the facts of this case; when, therefore, the Bank of England issued their process of outlawry against the Messrs. Reid, the fund in question belonged to them, and was liable to be applied in satisfaction of the ten bills upon which the judgment was finally recovered; but as the fund was not sufficient for that purpose, it was just and equitable that it should be applied *pro rata* upon all the bills, according to the direction of the superior court, whose judgment ought to be affirmed.

Judgment affirmed.